IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: OLD BPSUSH, INC., *et al*., | ) | Chapter 11 |
| | ) | Case No. 16-12373 (BLS) |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| THESEUS STRATEGY GROUP LLC, | ) | Adv. No. 19-50726 (BLS) |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KARYN BARSA, JOAN DEA, | ) | C.A. No. 20-1450 (MN) |
| C. MICHAEL JACOBI, MATTHEW | ) | |
| MANNELLY, BERNARD MCDONELL, | ) | |
| BOB NICHOLSON, MARK VENDETTI, | ) | |
| and JULIE ZALESKI, | ) | |
| | ) | |
| Appellees. | ) | |

## **MEMORANDUM OPINION**

Andrew M. Carty, BROWN RUDNICK LLP, New York, NY; James W. Stoll, Brian M. Alosco, BROWN RUDNICK LLP, Boston, MA; Garvin McDaniel, HOGAN MCDANIEL, Wilmington, DE – Counsel to Appellant Theseus Strategy Group LLC, in its capacity as Litigation Representative for Old PSG and the PSG Trust.

Robert A. Fumerton, Lisa Laukitis, William J. O'Brien, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, NY; Paul J. Lockwood, Jason M. Liberi, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, DE – Counsel to Director Appellees Karyn Barsa, Joan Dea, C. Michael Jacobi, Matthew Mannelly, Bernard McDonell, and Bob Nicholson.

Chris Paparella, Nathaniel J. Kritzer, STEPTOE & JOHNSON LLP, New York NY; John J. Byron, STEPTOE & JOHNSON LLP, Chicago, IL; Jeremy W. Ryan, D. Ryan Slaugh, POTTER ANDERSON & CORROON LLP, Wilmington, DE – Counsel to Officer Appellees Mark Vendetti and Julie Zaleski.

September 29, 2021
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

Pending before the Court is an appeal by Theseus Strategy Group LLC ("TSG" or "Trustee") seeking reversal of the Bankruptcy Court's Order, dated October 13, 2020 (APP0036-37)[1] ("the Order") and related opinion, dated June 30, 2020 (APP0001-35) ("the Opinion" or "Op.") dismissing TSG's counterclaims in the above-captioned adversary proceeding.

As noted by the Bankruptcy Court, the adversary proceeding arrived via an "untraditional route." (APP0002).  Typically, when a confirmed plan creates a litigation trust, a litigation trustee may pursue litigation, often including claims against former officers and directors.  Here, however, the reverse happened: the adversary proceeding was filed by former officers and directors against TSG.  The complaint alleged that TSG had threatened to sue the former officers and directors, even though their asset preservation efforts were so successful that they obtained "the best possible result for creditors, equity holders, and employees alike."  (APP0050-0091 ("Complaint") ¶¶ 1-2, 5).  The former officers and directors argued that pursuit of this litigation by TSG was a breach of TSG's fiduciary duty to the litigation trust and its beneficiaries.  (*Id*. ¶ 8).  The Complaint sought the following relief: (i) monetary damages and disgorgement for TSG's breach of the fiduciary duties of loyalty and good faith, (ii) a declaratory judgment that the former officers and directors have not breached their fiduciary duties, did not cause the Company's bankruptcy filing, are not liable for any damages caused by the bankruptcy, and (iii) a permanent injunction removing TSG as litigation trustee.  (*Id*. ¶ 10).

---

[1]     The appendix (D.I. 17) to TSG's opening brief (D.I. 16) is cited herein as "APP__."  The docket of the chapter 11 cases, captioned *In re Old BPSUSH, Inc.*, No. 16-12373 (BLS) (Bankr. D. Del.), is cited herein as "B.D.I. __," and the docket of the adversary proceeding, captioned *Barsa et al. v. Theseus Strategy Group LLC*, Adv. No. 19-50726 (BLS), is cited herein as  "Adv. D.I. __."  TSG's opening brief (D.I. 16) is cited herein as "TSG Br. __".

In response, TSG filed an answer and counterclaims, alleging that the former officers and directors breached their fiduciary duties of good faith and loyalty, under Delaware law and British Columbia law, and for corporate waste.  (APP0092-0220 ("Counterclaims")).

The former officers and directors filed separate motions to dismiss the Counterclaims with prejudice.  (APP0221-0301; APP302-350).[2]  The Bankruptcy Court entered an order granting the Motions to Dismiss and dismissing all of TSG's Counterclaims with prejudice.  (Adv. D.I. 56, APP00956).  TSG filed a motion for reconsideration (APP0957-990) which was denied by the Order on appeal.  (APP0036-37).  For the reasons set forth herein, the Court will affirm the Order.

I.    **BACKGROUND**

    A.    **Parties**

Prior to filing bankruptcy, Performance Sports Group Ltd. ("PSG" or "the Company") was a manufacturer of sporting goods equipment and apparel in the hockey, baseball, softball, lacrosse, and soccer sporting segments.  (Counterclaims ¶ 18).  On October 31, 2016, PSG and its wholly owned subsidiaries ("the Debtors") filed chapter 11 petitions in the Bankruptcy Court.[3]  Pursuant to § 1102 of the Bankruptcy Code, both a committee of unsecured creditors and a committee of holders of equity interests were appointed in this case ("the Committees").

Mark Vendetti, the Chief Financial Officer, and Julie Zaleski, the Controller and Treasurer, (together, "the Officers") (APP0137 ¶¶ 16-17), were the officers responsible for managing the

---

[2]    TSG filed a separate motion for judgment on the pleadings regarding the claims in the Complaint (Adv. D.I. 30), which was granted without prejudice for the reasons stated on the record at the September 23, 2020 hearing (APP1066-1107).

[3]    PSG was a British Columbia, Canada company with a principal place of business in Exeter, New Hampshire.  The subsidiary Debtors included some United States corporations and some Canadian corporations.  Each of the Debtors also filed for protection from their creditors under Canada's Companies' Creditors Arrangement Act ("CCAA") in the Ontario Superior Court of Justice (Commercial List) ("the Canadian Court" and the filing, "the Canadian Proceedings").

Company's audit process and ensuring that KPMG, the Company's auditor, received all requested information in a timely manner.  (APP0140 ¶ 25).  Appellees Barsa, Dea, Jacobi, Mannelly, McDonell, and Nicholson (collectively, "the Directors") were members of the Board of Directors of PSG ("the Board").  (APP0136-37 ¶¶ 10-15).  Dea, Jacobi, and McDonell were also members of the Audit Committee of the Board ("the Audit Committee").  (*Id.*).

###    B.    The Chapter 11 Cases and the Adversary Proceeding

On February 28, 2017, the Debtors consummated a sale of substantially all of their assets under § 363 of the Bankruptcy Code.  (B.D.I. 1474 at 35).  The Debtors' plan of liquidation (B.D.I. 1473) ("the Plan") was confirmed on December 20, 2017 (B.D.I. 1566) ("Confirmation Order").  The Plan contained a "Global Settlement" of all issues and controversies between the Debtors and the Committees and provided for, among other things: (a) the payment in full of all allowed general unsecured claims without post-petition interest (to the extent it would have been allowable); (b) the resolution of all disputes regarding the treatment of intercompany claims and equity interests; (c) the resolution of all disputes regarding allocation of value among the Debtors and the allocation of the asset sale proceeds; and (d) the resolution of all disputes regarding substantive consolidation of the Debtors.  (Plan at 24).  The Plan also appointed Theseus Strategy Group LLC ("TSG") to serve as liquidation trustee of the Old PSG Wind Down Liquidation Trust ("the Trust") and as litigation representative of the Trust and the Debtors.  (Confirmation Order ¶¶ 14-22; Plan § 5.E).

On October 23, 2019 – more than two and a half years following confirmation of the Plan – the former Officers and Directors filed the Complaint against TSG for monetary, injunctive, and declaratory relief in connection with "threatened" litigation by TSG.  On November 11, 2019, TSG filed its Answer and Counterclaims asserting the following: (1) breach of fiduciary duty of care against the Officers; (2) breach of fiduciary duty of loyalty and good faith against the Officers;

(3) breach of fiduciary duty and duty of care, under British Columbia Business Corporations Act Section 142, against the Officers; (4) breach of fiduciary duty of loyalty and good faith against the Directors, and against Dea, Mannelly, and McDonell, as members of the Audit Committee; (5) breach of fiduciary duty and duty of care, under British Columbia Business Corporations Act Section 142, against the Directors, and against Dea, Mannelly, and McDonell, as members of the Audit Committee; and (6) corporate waste against the Directors, and against Dea, Mannelly, and McDonell, as members of the Audit Committee.

### C.     The Counterclaim Factual Allegations

TSG's Counterclaims assert over 200 paragraphs of factual allegations which are thoroughly set forth in the Opinion (APP0006-0017) and repeated here for ease of reference.

### 1.     Company Background

PSG began as a hockey-only company under the Bauer hockey brand. (Counterclaim ¶ 36). Between 2012 and 2014, the Company engaged in a number of acquisitions of sporting goods suppliers, including Combat Sports ("Combat") and Easton Baseball/Softball ("Easton"), both of which manufactured and sold baseball equipment to sports retailers. (*Id*. ¶ 37). TSG alleges that acquiring so many companies over a short period of time resulted in PSG's failure to integrate the various businesses into a seamless centralized business. (*Id*. ¶¶ 44-48).

PSG's internal sales policy included "standard-term contracts," which sold product to customers pursuant to written contracts that transferred the product's title to the customer upon delivery, and required payment in net 90 days or net 120 days, depending on the contract terms. (*Id*. ¶ 41). Any contracts with customers which deviated from those set forth in the standard-term contracts were referred to within PSG as "non-standard-term contract." (*Id*. ¶ 42). Two non-standard-term contracts include so-called "consignment" contracts and "guaranteed sale" or "right of return" contracts. (*Id*. ¶ 43).

PSG had two loan facilities (a revolver and a term loan), and, as of the bankruptcy filing, PSG's outstanding obligations under the loan facilities totaled approximately $490 million. (*Id*. ¶¶ 54-55). PSG was required to provide its lenders with audited financial statements annually, within 90 days of the end of each fiscal year. (*Id.* ¶ 56). A failure to timely provide these financials, if uncured, would result in an event of default under the loans. (*Id*. ¶¶ 56-57). Because PSG was a publicly traded company, it also was required to file its annual report and audited financial statements with the Securities and Exchange Commission no later than August 15. (*Id*. ¶ 58).

### 2.     The Audit for FYE 2016

KPMG was, at all relevant times, PSG's auditor. (*Id*. ¶ 19). Beginning in August 2015 and throughout fiscal year ending ("FYE") 2016, KPMG informed PSG that there was a significant deficiency in PSG's contract management practices and policies ("the Contract Management Significant Deficiency"). (*Id*. ¶¶ 49-53). At the close of the FYE 2015 Audit, KPMG specifically stated that a lack of communication between sales/operations personnel, who have the ability to enter into customer agreements, and finance personnel, who monitor the accounting consequences, had resulted in accounting errors and revenue reversals in fiscal years 2012, 2013, and 2014. (*Id*. ¶ 50). The following day, KPMG informed the Audit Committee of the Contract Management Significant Deficiency. (*Id*. ¶ 51). TSG claims that neither the Board, the Audit Committee, nor the Officers developed and implemented a remediation plan and instead permitted the decentralized contract control to continue throughout FYE 2016. (*Id*. ¶¶ 53, 100).

Between May 2016 and August 2016, KPMG was engaged in its annual audit of PSG's books and records for FYE 2016. (*See generally id.* ¶¶ 64-82). TSG alleges that KPMG had increased the risk assessment for the FYE 2016 Audit due to a series of adverse events that came to light beginning in December 2015 and extending through April 2016. (*Id*.) These included allegations of improper sales practices, securities fraud lawsuits alleging concealment of such

practices, and governmental investigations into those allegations.  (*Id*.).  Notwithstanding these

adverse events, the Counterclaims allege that the Officers interpreted the heightened testing by

KPMG as suddenly hostile to management and its practices.  (*Id*. ¶¶ 76-81).

TSG alleges that the Officers' mismanagement of the audit process culminated with certain

non-standard-term contracts between Easton and Dunham's Sports ("Dunham's"), one of Easton's

largest customers.  (*Id*. ¶¶ 83-171).  In March 2016, Easton's Director of Finance notified Zaleski

that Easton had improperly recognized $200,000 in previously booked revenue arising from an

oral consignment (i.e., non-standard-term) contract, and Easton had used a manual journal entry

to reverse the revenue.  (*Id*. ¶ 95).  Zaleski informed Vendetti of the oral consignment contract.

(*Id*.).  When reviewing the Company's financials in April 2016, KPMG asked Zaleski about the

$200,000 manual journal entry and Zaleski disclosed the existence of Dunham's oral consignment

contract.  (*Id*. ¶ 96).  TSG claims that Zaleski assured KPMG that the oral consignment agreement

did not impact the reliability of Dunham's $2.2 million overall receivable, which was otherwise

based on standard-term contracts.  (*Id*.).  The Counterclaims assert that this representation turned

out to be inaccurate because the Company's contract controls prevented Zaleski from gaining full

knowledge of the contracts between Easton and Dunham's.  (*Id*. ¶¶ 96-97).  Zaleski would soon

learn that approximately 20% of the remaining Dunham's receivable related to product shipped

under another non-standard-term contract, known as the "Guaranteed Sale Contract."  (*Id*. ¶ 96).

TSG alleges that in May 2016, the Officers became aware of the Dunham's Guaranteed

Sale Contract, which resulted in about $400,000 of improperly recognized revenue.  (*Id*. ¶¶ 101-

102).  TSG further alleges that the Officers directed Easton's Finance Director to make a manual

journal entry reversing the previously recognized revenue of $421,000, but the Officers did not

inform KPMG of the existence of Dunham's Guaranteed Sale Contract or the corrective

accounting entry in May or June 2016.  (*Id*.).  The Counterclaims assert that the Officers withheld

the information based on their belief that the information was immaterial, and because they were concerned that KPMG would overreact or react negatively.  (*Id*. ¶¶ 77-82, 103).

TSG alleges that, eventually, circumstances involving another of the Company's business segments, Combat, resulted in the disclosure of the Dunham's Guaranteed Sales Contract, but not until the Officers had already made a number of misstatements that TSG ultimately destroyed the faith in management that an auditor must have in order to rely on management's representations. (*Id*. ¶¶ 105-148).   The Combat division was not included by KPMG in the audit because it represented less than 2% of PSG's revenues, but on June 20, 2016, upon learning of a potentially large return at Combat, Vendetti determined to conduct an internal audit of the Combat division. (*Id*. ¶¶ 105-107, 109).  When the internal audit was completed in mid-July, the Officers learned about the existence of four Combat customers with non-standard-term contracts (including one with Dunham's) in contravention of stated Company policy, which resulted in improper revenue recognition by the Company.  (*Id*. ¶¶ 110-112).  On July 26, 2016, Vendetti advised KPMG's lead audit partner, David Wilson ("Wilson"), of the results of the Combat internal audit, and they agreed that the issue of non-standard-term contracts at Combat should be brought to the attention of the Audit Committee at a meeting later that day.  (*Id*. ¶¶ 112-115).  The Counterclaims allege that the Officers did not inform KPMG or the Audit Committee of Dunham's Guaranteed Sale Contract with Easton at that time.  (*Id*. ¶¶ 116-118).

On July 28, 2016, Vendetti met with Wilson and KPMG's internal forensic accounting expert to further discuss the Combat internal audit.  (*Id*. ¶ 132).  Wilson asked if Combat and Easton had any overlapping customers and, thus, whether there was a risk of similar non-standard-term contracts at Easton.  (*Id*. ¶ 134). TSG alleges that Vendetti confirmed that there were overlapping customers between Combat and Easton, but that the two divisions operated entirely separately from one another (e.g. different employees, sales staffs), and there was no reason to

believe anything that occurred between Combat and its customers could occur between Easton and its customers. (*Id.* ¶ 135). TSG claims that Vendetti did not disclose the existence of the Dunham's Guaranteed Sale Contract at Easton that had been discovered internally in May 2016. (*Id.* ¶ 136).

Following the July 28 meeting, KMPG requested additional information related to crossover customers and, in response, PSG provided KPMG with additional general ledger information regarding the manual journal entries, but with no specific explanation. (*Id.* ¶¶ 137-140). In an internal e-mail exchange on August 2, 2016, Vendetti informed the PSG accounting staff that failing to get KPMG all requested information that day risked the timely completion of the FYE 2016 Audit and would be a "disaster" for PSG. (*Id.* ¶¶ 144).

Upon reviewing the additional general ledger information, a KPMG Audit team member noticed a manual journal entry entitled "Dunham RTV [return to vendor]" and asked PSG's finance team about the June 22, 2016 manual journal entry and return. (*Id.* ¶ 141). The Counterclaims assert that, confronted with KPMG's inquiries, on August 4, 2016, the Officers disclosed the existence of Dunham's Guaranteed Sale Contract at Easton. (*Id.* ¶¶ 148-149).

Wilson informed Vendetti that Dunham's Guaranteed Sale Contract was a "significant issue" because "Easton [was] a much bigger operation than Combat" and because the vice president of sales at Easton was one of senior management responsible for signing representation letters that were submitted to KPMG on a quarterly basis. (*Id.* ¶ 150). At an emergency Audit Committee meeting on August 5, 2016, attended by Wilson and KPMG audit team members, Vendetti informed the Audit Committee of Dunham's Guaranteed Sale Contract at Easton and, for the first time in response to a direct question by an Audit Committee member, disclosed that he and Zaleski had been aware of the contract since May 2016. (*Id.* ¶¶ 151-153). TSG alleges that the delay in disclosure concerned the KPMG audit team, but KPMG agreed that PSG's regular

corporate counsel should secure affidavits from PSG's relevant management personnel assuring that no systemic problem existed.  (*Id*. ¶¶ 154-156).

On August 6, 2016, Wilson met with Vendetti and asked him why he had not disclosed the existence of the Dunham's contract earlier.  (*Id*. ¶ 157).  TSG alleges that, according to Wilson, Vendetti expressly stated that although he (Vendetti) thought the contract was immaterial, he believed Wilson would blow it out of proportion.  (*Id*. ¶¶ 157-159).  TSG further alleges that this caused Wilson to believe that the Officers had not been honest with him and the rest of the KPMG audit team.  (*Id*. ¶¶ 160, 171).

### 3.    The Board's Conduct and the Investigation

Following an August 6, 2016 telephone conversation between Audit Committee members and KPMG, the Committee directed PSG's corporate counsel to prepare a written explanation of the Dunham's issue, and a work plan to provide KPMG with additional information to convince KPMG of the veracity of the Company's financial statements.  (*Id*. ¶ 172).  Counsel prepared both documents on August 6 and 7, 2016.  The work plan outlined a series of actions to be completed by no later than August 11, 2016.  (*Id*. ¶ 173).

At an Audit Committee meeting on August 8, 2016, however, KPMG refused to complete the audit or accept management representations without completion of an internal investigation by independent counsel into management integrity and sales practices.  (*Id*. ¶¶ 174-176).  The Counterclaims assert that, although the Audit Committee initially argued that Dunham's Guaranteed Sale Contract was an immaterial amount – $400,000 in a company with over $500 million in annual revenues – and that an independent investigation would delay timely completion of the Audit, the Audit Committee, and later the full Board, agreed to retain independent outside counsel to conduct the investigation.  (*Id*. ¶¶ 175-177).  The Audit Committee retained outside counsel – Richards Kibbe & Orbe LLP ("RKO") – on the recommendation of its Canadian

corporate counsel, even though TSG alleges that RKO could not to commit to completing the investigation in a timeframe that would address KPMG's concerns, secure a completed audit, timely file PSG's annual report and audited financial statements, and allow the Company to remain in compliance with its secured loans.  (*Id*. ¶ 181).  On August 29, 2016, the Board secured a 60-day extension from its lenders (through October 29, 2016) to provide PSG's fiscal year 2016 annual report and consolidated audited financial statements.  (*Id*. ¶ 187).

TSG alleges that, as of August 8, 2016, PSG's common stock was trading at approximately $3.40 per share, implying a market capitalization for PSG's stock of approximately $150,000,000. (*Id*. ¶ 179).  On August 11, 2016, the day after the Board hired RKO to conduct the investigation, the Board approached the Company's largest shareholder, Sagard Capital Partners, L.P. ("Sagard") and asked if it would entertain taking the Company private.  (*Id*. at 182).  The Counterclaims assert that Sagard indicated that it would "in a heartbeat."  (*Id*.).  That same day, PSG retained Alvarez & Marsal North America LLC to assist PSG in preparing for a bankruptcy filing to facilitate such a transaction.  (*Id*. ¶ 183).

On August 19, 2016, PSG retained an investment banker (Centerview Partners LLC) to market its assets for sale and provide restructuring advice.  (*Id*. ¶ 185).  On or about August 25, 2016, PSG considered slowing down or stopping RKO's investigation in light of the decision to file bankruptcy, but, TSG alleges, it did not end the investigation at the time because that would require public disclosure.  (*Id*. ¶ 186).  By mid-September, PSG had reached agreement with Sagard who thereafter became the stalking horse bidder in the bankruptcy proceedings that followed.  (*Id*. ¶¶ 185, 198).

TSG further alleges that RKO's investigation efforts did not seriously begin until after the bankruptcy filing and the auction and sale of PSG's assets.  (*Id*. ¶¶ 194-195).  For example, TSG claims that Vendetti and Zaleski were not interviewed until February 2017, after PSG filed

bankruptcy, signed a stalking horse agreement, participated in a § 363 auction process, and obtained a buyer for PSG's operating business.  (*Id*. ¶¶ 194-198).  On or about March 27, 2017, RKO conveyed an oral report to the Audit Committee, attended by KPMG, summarizing the results and conclusions from its investigation to date, and announcing that no further investigation would be conducted as the purpose was mooted by the sale.  (*Id*. ¶¶ 199-200).  KPMG resigned as PSG's auditor pursuant to a letter, dated March 27, 2017, that identified the reasons for withdrawal as: (i) potential illegal acts by the officers and directors, (ii) inadequate investigation by RKO, and (iii) failure to remediate issues raised by KPMG.  (*Id*. ¶ 201).  TSG alleges that the investigation cost PSG over $6M and served no purpose.  (*Id*. ¶ 193).

      **D.**     **The Opinion, Order, and Appeal**

On June 30, 2020, the Bankruptcy Court entered its Opinion granting the Officers' and Directors' Motions to Dismiss.  (APP0001-35).  TSG filed a motion for reconsideration, which Officers and Directors opposed.  (APP0992-1016; APP1017-1027).  On October 13, 2021, the Bankruptcy Court entered the Order denying the motion for reconsideration, dismissing TSG's Counterclaims, and dismissing the Complaint.  (APP0036-49).

TSG filed a timely notice of appeal of the Order.  The appeal is fully briefed.  (D.I. 16, 20, 21, 23, 24).  The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II.   JURISDICTION AND APPLICABLE STANDARDS

The Court has jurisdiction to hear an appeal from a final judgment of the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1).  The Order is a final, appealable order.

"An appeal from a bankruptcy court's order places the district court in the posture of an appellate tribunal, requiring it to accord the appropriate level of deference to the decision of the

bankruptcy judge." *Welke v. Miller (In re United Tax Grp., LLC),* 2018 WL 385185, at *1 (D. Del. Jan. 11, 2018). In this role, district courts "review the bankruptcy court's legal determinations de novo, its factual findings for clear error and its exercise of discretion for abuse thereof." *David v. Weinstein Co. Holdings, LLC,* 2021 WL 979603, at *2 (D. Del. Mar. 16, 2021) (citation omitted). As applicable here, a "Bankruptcy Court's dismissal of . . . breach of fiduciary duty claims is subject to de novo review." *In re LMI Legacy Holdings, Inc.,* 2020 WL 7339917, at *6 (D. Del. Dec. 14, 2020).

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain a short and plain statement showing that the pleader is entitled to some relief. *Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009). The pleading standard does not require detailed factual allegations, but it must be more than a defendant-unlawfully-harmed-me accusation. *Id.* When reviewing a motion to dismiss, the court will "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Crystallex Int'l Corp. v. Petróleos De Venezuela, S.A.,* 879 F.3d 79, 83 n.6 (3d Cir. 2018). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must show that the grounds of his entitlement to relief amount to more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 545 (2007).

"A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556). The plausibility standard is not akin to the probability standard but requires more than the sheer possibility that a defendant acted unlawfully. *Id.* at 678. Two principals underlie the *Twombly* standard. First, a court's acceptance of a complaint's allegations as true is inapplicable to legal conclusions, and threadbare recitals of cause of action

elements, supported by conclusory statements, will not suffice.  *Id*.  Second, determining whether a complaint states a plausible cause of action requires the court to rely on its experience and common sense.  *Id*.  *Twombly* requires that a pleading nudge claims "across the line from conceivable to plausible."  *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 550 U.S. at 570).

In the Third Circuit, "a court reviewing the sufficiency of a complaint must take three steps": (1) "it must take note of the elements the plaintiff must plead to state a claim"; (2) "it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787, 789 (3d Cir. 2016) (quotations omitted).  The court "do[es] not inquire whether a plaintiff will ultimately prevail" but "whether the [claimant] is entitled to offer evidence to support his or her claims."  *Borough of Moosic v. Darwin Nat'l Assurance Co.*, 556 F. App'x 92, 95-96 (3d Cir. 2014) (citation omitted).  The movant carries the burden of showing that the dismissal is appropriate.  *Paul v. Intel Corp. (In re Intel Corp. Microprocessor Antitrust Litig.)*, 496 F. Supp. 2d 404, 408 (D. Del. 2007).

## III.   **PARTIES' CONTENTIONS**

TSG argues that the Bankruptcy Court erred in dismissing the Counterclaims by: (i) misapplying the so-called "conclusory allegation" standard, which denied TSG's allegations the presumption of truth to which they are entitled; (ii) failing to clearly articulate which allegations it deemed conclusory and thus ignored; (iii) improperly drawing inferences in favor of the Officers and Directors, as moving parties, and failing to draw inferences in favor of TSG, as the non-moving party; and (iv) engaging in improper fact-finding at the pleading stage.  But for these legal errors, TSG argues, the Bankruptcy Court should have determined that TSG satisfied its pleading burden and denied the Motions to Dismiss.  (*See* D.I. 16 at 22).

13

The Officers assert that the Bankruptcy Court properly followed the process required by *Iqbal*/*Twombly* in determining that TSG had not stated claims for breach of the duty of care or loyalty. With respect to the duty of care, the Officers argue, TSG did not allege any facts showing that the Officers were recklessly uninformed or acted outside of the bounds of reason, as is required under governing case law to plead such a claim. (D.I. 21 at 10-12). Rather, TSG merely alleged that the Officers disclosed an immaterial, reversed revenue entry to KPMG when asked specifically about it, not before. The Officers assert that such allegations do not come close to stating a claim for gross negligence, as the Bankruptcy Court correctly ruled. (*See id*.). The Officers also argue that the Bankruptcy Court correctly ruled that these same facts do not state a claim for breach of the duty of loyalty, as such a claim can be sustained only by alleging facts involving more than gross negligence. (*Id*. at 21-24). Rather, the Officers must have knowingly and completely failed to undertake their responsibilities, and TSG did not allege any such facts.

Similarly, the Directors argue that TSG cannot point to a single factual allegation in support of what is, "at its core, a fanciful and unsupported thesis: that an independent and conflict-free Board, comprised of business professionals with decades of experience and untarnished reputations, deliberately chose to jeopardize those reputations by commissioning a "sham" (TSG Br. at 14) internal investigation whose sole purpose was to "mask" (*id*.) a predetermined decision to steer PSG towards bankruptcy and a sale – all the while wasting corporate assets." (*See* D.I. 20 at 4-5). The Directors argue that the allegations supporting the Counterclaims represent nothing more than TSG's hindsight-based disagreement with the strategic path taken by an independent, disinterested board, and the Bankruptcy Court correctly determined not to credit those allegations. (*See id*. at 4-5).

Finally, as TSG now concedes that the same legal standards govern its claims under British Columbia law, the Officers and Defendants argue that those claims were properly dismissed for

the same reasons that the claims under Delaware law were dismissed and the Order should be affirmed.

## IV.   ANALYSIS

### A.   Breach of Duty of Care Claim Against the Officers

The fiduciary duty of care requires that officers and directors both: (1) "use that amount of care which ordinarily careful and prudent men would use in similar circumstances;" and (2) make business decisions by "consider[ing] all material information reasonably available." *Bridgeport Holdings Inc. Liquidating Trust v. Boyer* (*In re Bridgeport Holdings, Inc.*), 388 B.R. 548, 568 (Bankr. D. Del. 2008).   "A claim for breach of the duty of care requires a showing of gross negligence which generally 'requires directors and officers to fail to inform themselves fully and in a deliberate manner.'"  *In re Opus East, LLC*, 528 B.R. 30, 66 (Bankr. D. Del. 2015).  In contrast to ordinary negligence, "[g]ross negligence" is an "extreme departure from the ordinary standard of care."  *Id*. at 398.  To meet this standard at the pleading stage, TSG was required to allege facts that plausibly showed the Officers were "'recklessly uninformed' or acted 'outside of the bounds of reason.'"  *Id.*

The Bankruptcy Court determined that TSG did not meet this high standard because the Counterclaims did not allege any act by the Officers that could be regarded as "recklessly informed" or "outside the bounds of reasons."  (APP0024).  The Bankruptcy Court reasoned:

> The allegations show that the Officers promptly corrected the revenue overstatements, which they plausibly believed were immaterial, in the Company's books and records and disclosed the information about non-standard term contracts to KPMG and the Audit Committee when asked.  The Trustee's factual allegations rest mainly [on] ***conclusory accusations that the delay in disclosure destroyed trust and – in short – is not how prudent officers should handle an audit***.  However, the facts underlying the allegations do not demonstrate anything approaching an extreme departure from the ordinary standard of care.  There are no allegations that the Officers were recklessly uninformed or that their handling of the

15

audit fell outside the bounds of reason.  There are no allegations of
gross negligence . . . .

(APP0024) (emphasis added).  TSG argues that, as the corporate officers responsible for ensuring

that PSG's audit was timely and properly completed, the Officers "owed a fiduciary duty" to PSG

"to cooperate with KPMG fully and honestly to ensure a completed audit."  (D.I. 16 at 23).

According to TSG, the Counterclaims alleged sufficient facts to state a plausible claims that the

Officers breached this fiduciary duty by "destroying the trust of KPMG through a series of specific

events over the course of several months," including: recklessly representing to KPMG that no

other Dunham non-standard contracts existed; failing to correct that misrepresentation

immediately upon discovery the following month; wrongly representing that no other non-standard

contract could exist at Easton, despite knowing of Dunham's Guaranteed Sale Contract, and only

disclosing that contract upon repeated questioning; having discussed, prior to disclosing the

existence of the contact, whether the contract could be inaccurately characterized as part of

Dunham's Consignment Arrangement; and Vendetti's admission that, despite having known of

the contract since May, he chose not to disclose it because he thought that KPMG would overreact

to what was, in Vendetti's view, an immaterial matter.  (*See* TSG Br. at 22-30).  The Counterclaims

further allege that this revelation was so shocking that KPMG demanded an emergency Audit

Committee meeting and subsequently demanded an investigation before completion of the audit.

According to TSG, these allegations, and all inferences drawn therefrom, make a plausible case

that Vendetti and Zaleski "so thoroughly mishandled the disclosure of information to KPMG that

they caused the failed audit and the train of events that followed."  (*Id.* at 30).  By failing to view

the Counterclaims in the light most favorable to TSG, TSG argues that the Bankruptcy Court

committed reversible error.

As an initial matter, the Officers argue, any argument that they owed a fiduciary duty "to

cooperate with KPMG fully and honestly to ensure a completed audit" (TSG Br. at 23) is

groundless.  The duty to auditors that TSG seeks to impose would exceed an officer's duty of care to a corporation and its shareholders, which requires only that officers not take actions that are grossly negligent.  The Court agrees.  TSG cites no Delaware case holding that an officer must immediately disclose an immaterial accounting adjustment to an auditor, let alone that failing to do otherwise is "outside the bounds of reason" or "recklessly uninformed."  *See In re Solutions Liquidation LLC*, 608 B.R. 384, 397-98 (Bankr. D. Del. 2019).  As this duty does not exist under Delaware or British Columbia law, it provides no ground for reversal.

TSG argues that the Bankruptcy Court failed to credit all of TSG's factual allegations. (TSG Br. at 25-27).  According to TSG, the Bankruptcy Court improperly characterized as conclusory its allegations "that the delay in disclosure destroyed trust" and was "not how prudent officers should handle an audit."  (APP0024).  Conversely, the Officers argue that TSG does not identify a single specific fact that the Bankruptcy Court failed to consider or inappropriately disregarded.  "Stripped of labels and conclusions," the Officers argue, "the alleged misconduct by the Officers consisted of disclosing the immaterial, reversed $421,000 entry to KPMG when asked about it specifically, not before."  (D.I. 21 at 11-20).

As the Officers point out, the allegation "that the delay in disclosure destroyed trust" is irrelevant, as the Officers' conduct is what matters here – not KMPG's reaction.  Nonetheless, TSG argues that this allegation was improperly deemed conclusory despite the fact that it was supported by substantial factual allegations.  TSG argues that "a 'conclusory' allegation is typically one that incorporates a legal conclusion" while "[a]llegations that explain ***how*** a defendant is allegedly liable, rather than simply paraphrasing legal elements, are not conclusory." (TSG Br. at 26) (emphasis in original).  But the cases cited – *McDermott v. Clondalkin Group, Inc.*, 649 F. App'x 263 (3d Cir. 2016) and *Connelly* – held only that an allegation that "embodies a legal point" is the "***clearest indication***" that an allegation is conclusory."  *Connelly*, 809 F. 3d at

17

790 (emphasis added); *see also McDermott*, 649 F. App'x at 269 (same and quoting *Connelly*).   In *Connelly*, the Third Circuit emphasized that "some allegations, although not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual."   *Connelly*, 809 F. 3d at 790 (quoting *Peñalbert-Rosa v. Fortuño-Burest*, 631 F.3d 592, 595 (1st Cir. 2011)) (internal quotation marks omitted).   That rule is consistent with the Bankruptcy Court's determination.

The Third Circuit has consistently rejected generalized and vague allegations as conclusory that are not legal conclusions.   *See, e.g., Clemmons v. United States*, 793 F. App'x 109, 113 (3d Cir. 2019) ("Clemmons' amended complaint merely stated conclusory assertions about IMS and Heftler, and we have repeatedly held that 'conclusory or bare-bones allegations will no longer survive a motion to dismiss.'") (citation omitted).   The allegations that the Third Circuit has deemed conclusory include conclusions drawn by the plaintiff based on its perception of the facts – similar to TSG's assertion that the "delay in disclosure destroyed trust."   *See, e.g., Yucis v. Sears Outlet Stores, LLC*, 813 F. App'x 780, 785 n.8 (3d Cir. 2020) (citing *Connelly* and stating "While Yucis does allege that she 'attempted to redress the situation with Sears Corporate' and 'received no satisfaction whatsoever, nor any response of accountability,' that allegation is so general as to be conclusory, and thus is not entitled to the presumption of truth on a motion to dismiss"); *Miller v. Comcast*, 724 F. App'x 181, 182 (3d Cir. 2018) (rejecting "vague and conclusory allegations that Comcast has released films, television shows, music, and commercials portraying [the plaintiff] negatively").

Here, the Bankruptcy Court identified and enumerated Theseus's non-conclusory allegations of fact in support of TSG's generalized assertion about the delay in disclosure and destruction of trust and found them insufficient to state a claim.  (APP0022-24).   In reaching the conclusion that the alleged conduct did not establish gross negligence, the Bankruptcy Court

18

contrasted the conduct alleged in the Counterclaims with the egregious conduct involved in the

two cases on which TSG relied, *In re Enivid, Inc.*, 345 B.R. 426, 452 (Bankr. D. Mass. 2006)

(analyzing Delaware law) and *Miller v. U.S. Foodservice, Inc.*, 361 F.Supp.2d 470, 479-80

(D. Md. 2005):

> In *Enivid*, the officers misled the board on material issues by
> promoting, and voting in favor of, acquisitions based on falsified
> projections.  In *Miller*, the CEO's misrepresentations resulted in an
> overstatement of earnings of $900 million.  The Court concludes
> that the Officers' alleged misconduct does not come anywhere near
> the level of wrongdoing in *Enivid* or *Miller*.

(APP0023-24 (citations omitted)).

As to the allegation that the Officers failed to act as "prudent officers," both the Supreme

Court and the Third Circuit have held that "formulaic recitation[s]" of the elements of a cause of

action are conclusory and are appropriately discredited when deciding a motion to dismiss.  *See*

*Iqbal*, 556 U.S. at 678; *Connelly*, 809 F.3d at 789.  Thus, TSG's allegation that the Officers failed

to act as "prudent officers" is simply a recitation of what must be plead and ultimately proven to

demonstrate that the Officers breached their duty of care.  *See Solutions Liquidation*, 608 B.R. at

398 (requiring plaintiff to show an "extreme departure from the ordinary standard of care" to

sustain a duty of care claim).

TSG further argues that the Bankruptcy Court erred by drawing several improper

inferences against it.  (TSG Br. at 27-30).  First, TSG argues that the Bankruptcy Court drew an

improper inference in stating that the Officers "disclosed the information about non-standard-term

contracts to KPMG . . . when asked."  (*Id*. at 27-30).  But the Court agrees with the Officers that

this was not an inference but rather a fact alleged in the Counterclaims.  TSG alleged that when

KPMG asked a specific question that called for the disclosure of the Dunham's contract, the

Officers disclosed the information to KPMG.  (APP0175, ¶¶ 170-171 (alleging that the Officers

disclosed the Dunham's contract when asked specific questions about it); APP0160-61, ¶ 103;

*see also* TSG Br. at 7 (conceding that the Officers disclosed the Dunham's contract to KPMG "when specific questioning" called for that information)).

TSG further asserts that the Bankruptcy Court erred in concluding the Officers "plausibly believed" that the revenue overstatements related to the Dunham's contract were "immaterial." The Counterclaims alleged that Vendetti did not disclose "the existence of the Dunham's Sale Contract earlier" because "he thought that the Dunham's Guaranteed Sale Contract was immaterial and that KPMG would overact in a negative way to that information." (APP0172, ¶ 159). TSG further admitted in its Opposition to Defendants' Motion to Dismiss that "the undisclosed contracts were not material in amount." (APP0357). It is undisputed that the entry represented less than one-half of one percent of PSG's quarterly revenues of $153 million and less than one-tenth of one percent of PSG's projected annual revenues. (APP0152-53, ¶¶ 66, 70). The Court finds no error.

Moreover, the Court agrees that TSG's focus on whether the information was subjectively important to KPMG is misplaced. (TSG Br. at 29). Materiality is an objective standard which these allegations do not satisfy. *See Rosenblatt v. Getty Oil Co*., 493 A.2d 929, 944 (Del. 1985); *In re Cogent, Inc. S'holder Litig*., 7 A.3d 487, 510 (Del. Ch. 2010). As the Officers correctly point out, courts have routinely dismissed similarly immaterial disclosure claims. *See In re BJ's Wholesale Club, Inc. S'holders Litig*., 2013 WL 396202, at *13 (Del. Ch. Jan. 31, 2013) (dismissing bad faith claim based on allegedly misleading and inaccurate proxy statement because the misstatement was immaterial and subsequently revised); *Kurz v. Holbrook*, 989 A.2d 140, 184 (Del. Ch. 2010) (dismissing disclosure claims for lack of materiality), *rev'd in part on other grounds*, *Crown EMAK Partners, LLC v. Kurz*, 992 A.2d 337 (Del. 2010); *Pfeffer v. Redstone*, 2008 WL 308450, at *8 (Del. Ch. Feb. 1, 2008) (dismissing claim based on alleged false statement because it was immaterial), *aff'd*, 965 A.2d 676 (Del. 2009).

In sum, the Court finds no error in the Bankruptcy Court's application of *Iqbal* and *Twombly* in determining that the factual allegations did not permit a reasonable inference that the Officers were liable for breach of fiduciary duty of care.

## B.      Breach of Duty of Loyalty Claim and Good Faith Against the Officers

"Under Delaware Law, '[t]o state a legally sufficient claim for breach of the duty of loyalty, plaintiffs must allege facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs.'" *Solutions Liquidation*, 608 B.R. at 401 (quoting *In re Fedders N. Amer., Inc.*, 405 B.R. 527, 540 (Bankr. D. Del. 2009)).  The duty of loyalty, however, is "not limited to cases involving a financial or other cognizable fiduciary conflict of interest." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  "It also encompasses cases where the fiduciary fails to act in good faith." *Id*.

"The duty to act in good faith is a 'subsidiary element of the duty of loyalty.'" *Solutions Liquidation*, 608 B.R. at 401 (quoting *Fedders*, 405 B.R. at 540).  Claiming a failure to act in good faith must allege more than gross negligence. *McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008) (citing *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 65 (Del. 2006) ("[G]rossly negligent conduct, without more, does not and cannot constitute a breach of the fiduciary duty to act in good faith.")).  A lack of good faith is shown by alleging conduct motivated by a subjective bad intent, or conduct that is an "intentional dereliction of duty or the conscious disregard for one's responsibilities." *McPadden*, 964 A.2d at 1274 (citing *Walt Disney Co. Derivative Litig.*, 906 A.2d at 66-68).  The Delaware Supreme Court has identified three examples of conduct that may establish a failure to act in good faith:

> First, it has held that such a failure may be shown where a director "intentionally acts with a purpose other than that of advancing the best interests of the corporation."  Second, it has held that a failure may be proven where a director "acts with the intent to violate applicable positive law."  Third, it has held that a failure may be shown where the director "intentionally fails to act in the face of a

21

> known duty to act, demonstrating a conscious disregard for his
> duties" . . . "[T]here may be other examples of bad faith yet to be
> proven or alleged, but these three are the most salient."

*Fedders*, 608 A.2d at 1274 (quoting *Walt Disney*, 906 A.2d at 67).

As there are no allegations of self-dealing in this action, TSG was required to plead facts plausibly showing that the Officers failed "to act in good faith." *Stone*, 911 A.2d at 370. This required TSG to plead conduct by the Officers that amounts to an "intentional dereliction of duty or the conscious disregard for [their] responsibilities." *McPadden*, 964 A.2d at 1274. TSG argued that the Counterclaim allegations adequately asserted that the Officers recklessly misrepresented the existence of the Dunham's Guaranteed Sales Contract to KPMG, then failed to correct those misrepresentations in a timely manner, causing KPMG to mistrust management and refuse to complete the audit without an independent investigation. TSG asserts that these actions constitute bad faith because they fall within the "intentional dereliction of duty or the conscious disregard one's responsibilities." The Bankruptcy Court disagreed:

> The allegations in the Counterclaims fail to state that the Officers
> intentionally disregarded their duties in the face of a known duty to
> act or intended to harm the Company by acting with a purpose other
> than advancing the interests of the Company. The Officers clearly
> and reasonably considered the Dunham's overstatement of revenue
> immaterial and, even assuming the truth of allegations that the
> Officers suspected KPMG would 'blow it out of proportion,' the
> allegations are not sufficient to support a claim that the Officers
> acted fraudulently or intended to thwart the audit process." The
> allegations do not allege conduct that rises to the level of bad faith
> and, therefore, the claim against the Officers for breach of the
> fiduciary duty of loyalty and good faith must be dismissed.

(APP0026-27).

Loyalty claims predicated on bad faith must be supported by allegations amounting to "more than gross negligence." (APP0025 (citing *McPadden*, 964 A.2d at 1274)). "The proper inquiry is not whether a director [or here, the officer] neglected to do all that [he or she] should have under the circumstances, which implicates the duty of care, but rather whether the director

[or officer] 'knowingly and completely failed to undertake [his or her] responsibilities.'" *DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *13 (Del. Ch. Sept. 30, 2013) (quoting *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243-44 (Del. 2009)).  "[A] very extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors [or officers] were intentionally disregarding their duties." *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 654-55 (Del. Ch. 2008).  Such factual allegations were not contained in the Counterclaims.

The cases cited by TSG do not support reversal of the Order.  (*See* TSG Br. at 30-31).  TSG cites *McPadden*'s holding that "the intentional dereliction of duty or the conscious disregard for one's responsibilities [constitutes] bad faith conduct."  *McPadden*, 964 A.2d at 1274.  TSG further cites case law holding that a fiduciary acts in bad faith when he takes or fails to take any action that demonstrates a "faithlessness or lack of true devotion to the interests of the corporation and its shareholders." *Ryan v. Gifford,* 918 A.2d 341, 357 (Del. Ch. 2007); *Bridgeport*, 388 B.R. at 564.  According to TSG, the Third Circuit has also reversed dismissal of breach of the duty of loyalty claims against officers where "[w]hether the officers' behavior is construed as an egregious decision or as unconsidered inaction," the officers' "alleged passivity" was beyond reason. *Stanziale v. Nachtomi* (*In re Tower Air, Inc.*), 416 F.3d 229, 239 (3d Cir. 2005).

A review of these cases does not support reversal.  *Bridgeport* involved allegations that the defendants had engaged in an "abbreviated and uninformed" asset sale for "grossly inadequate compensation," *id*. at 565 – yet the court granted the officer defendants' motion to dismiss and distinguished the case from *Enivid*. *Id*. at 575.  In *McPadden*, the court found plausible allegations of gross negligence but not bad faith, where the officer defendant supervised a sale of assets to another company in which he had an interest and made no effort to solicit competitive bids. *McPadden*, 964 A.2d at 1270-73, 1275-76.  The *Ryan* case involved directors who made misrepresentations to shareholders in connection with soliciting votes to approve stock option

23

plans and then "surreptitiously" changed the dates on which the options were granted and falsely represented those dates in many public disclosures. *Ryan*, 918 A.2d at 357-58. Finally, *Tower Air* involved allegations that the officers did nothing when they were told by the director of safety of quality assurance problems with aircraft maintenance and of failures to record maintenance and repair work. *Tower Air*, 416 F.3d at 239.

TSG's reliance on *Gantler v. Stephens*, 965 A.2d 695 (Del. 2009) is also misplaced. (*See* TSG BR. at 31-32). There, the inference drawn by the Chancery Court – that the officer defendant only delayed delivery of the due diligence materials by a matter of days or a couple of weeks – was not supported by the allegations in the complaint. *Id*. at 709. Unlike that case, here the Bankruptcy Court's finding that the accounting entry was immaterial, and reasonably viewed as immaterial by the Officers, is supported by the allegations in the Counterclaims.

To plead bad faith, TSG was required to plead that there is not even "[o]ne plausible, and legitimate, explanation" for the conduct of the Officers. *In re Alloy, Inc.,* 2011 WL 4863716, at *12 (Del. Ch. Oct. 13, 2011); *see also BJ's Wholesale*, 2013 WL 396202, at *5 ("If the complaint states facts that could explain otherwise inexplicable bad faith conduct, the Court will not ignore the reasonable explanations."). The allegations contained in the Counterclaims plead otherwise.

## C.      Breach of Duty of Loyalty Claim Against the Directors

TSG does not argue that any of the Directors lacked independence or acted in a self-interested manner during the relevant time period. (*See* TSG Br. at 33-41). Therefore, TSG must plead facts demonstrating that the Directors engaged in deliberate, "bad faith" misconduct. (*Id*. at 30 (conceding that, under Delaware law, Counterclaims must plead an "intentional dereliction of duty or the conscious disregard for one's responsibilities."). The Directors argue that, as courts have repeatedly affirmed, "conscious disregard" is a standard that must be met with well-pled factual support. *See, e.g., Jaroslawicz v. M&T Bank Corp*., 2017 WL 1197716, at *7 (D. Del.

Mar. 30, 2017) (granting motion to dismiss fiduciary duty claim and noting that "[an] extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties") (citation omitted); *see also McElrath v. Kalanick*, 224 A.3d 982, 991-92 (Del. 2020) ("Pleading bad faith is a difficult task and requires 'that a director acted inconsistent with his fiduciary duties and, most importantly, that the director *knew* he was so acting.'" (citation omitted) (emphasis in original).  Here, the Bankruptcy Court held that the Directors' alleged course of conduct – which included hiring legal and financial advisors from several disciplines to assist their examination of strategic alternatives; retaining an outside law firm to conduct the investigation; and negotiating with PSG's lenders – was incompatible with "abdication" and "bad faith."

TSG asserts that this was error because the Counterclaims alleged that the Directors, despite believing PSG remained a "financially sound and robust operating business" with financial statements of unassailable veracity, "took no serious steps" to complete the investigation requested by the Auditor, and instead "immediately pivoted to a bankruptcy filing and a pre-negotiated sale of all of [PSG's] operating assets to the Company's largest shareholder."  (TSG Br. at 33). Conversely, the Directors assert that this single allegation is the core premise behind the appeal and that it is merely repeated, in various forms, throughout TSG's opening brief.  (*See id*. at 14-15 (labeling investigation a "sham . . . merely window dressing to mask the Board's decision to simply throw in the towel, file for bankruptcy, and sell off the company's assets"); *id*. at 36 ("[T]he Directors abdicated their responsibilities by immediately pivoting towards bankruptcy and the sale of the company's assets"); *id*. at 37 ("[I]t was wrong to make no attempts to conduct the investigation . . . ."); *id*. (claiming "the Directors . . . fail[ed] to even attempt to timely complete the investigation . . . .").  Thus, the Directors argue, TSG's central grievance can be characterized

25

as the Bankruptcy Court's refusal to adopt TSG's narrative.  The Court agrees that TSG ignores critical portions of the Bankruptcy Court's analysis.

The Bankruptcy Court drew extensively from TSG's own allegations in evaluating the Directors' conduct.  (*See, e.g.*, A0030 ("the Board directed corporate counsel to prepare a work plan") (citing Counterclaim ¶ 172 (A0175-79)); A0030 ("[T]he Board promptly engaged outside counsel and obtained a 60-day extension from the secured lender to provide consolidated audited financial statements") (citing Counterclaim ¶¶ 176-77, 181, 187 (A0176-77)); A0030-31 ("[T]he Board sought the guidance of experts to examine strategic alternatives by hiring outside advisors in disciplines ranging from law to investment banking to restructuring") (citing Counterclaim ¶¶ 181-83, 185 (A0178-79))).  These specific allegations of diligence, the Bankruptcy Court determined, could not be squared with TSG's claims of "bad faith" and "abdication."  (*See* A0030-32).

This determination fits within the analytical framework established by *Twombly* and *Iqbal*. As both decisions emphasize, deciding whether a plaintiff has "nudged" its claim "across the line from conceivable to plausible" is "a context-specific task that requires the . . . court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679-80; *cf. Twombly*, 550 U.S. at 566 ("We think that nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy."); *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011).  Here, it is not plausible to suggest that independent directors would have retained professional advisors, secured an extension from lenders, or engaged in months of strategic planning if their goal was simply to, in TSG's words, "throw in the towel" and preside over a "sham" investigation.  (TSG Br. at 14-15).  The Directors' conduct is simply not consistent with a claim of "abdication," and the Bankruptcy Court had ample grounds for holding that this behavior "did not rise[] to the level of bad faith."  (A0032).  *See Guy v. City of Wilmington*, 2019

26

WL 973579, at *4 (D. Del. Feb. 28, 2019) (granting motion to dismiss where "[p]laintiff simply asserts that the [defendant's] rationale was fabricated" but "provides no additional support for this allegation . . . Plaintiff's conclusory allegation lacks factual support and is insufficient.").

TSG further argues that the Bankruptcy Court improperly rejected several of its allegations as "hyperbole and conjecture." (TSG Br. at 37-38; *id*. at 36 (quoting A0032)). According to TSG, the Bankruptcy Court was required to give credit to these allegations even if they could be construed as such. (*See id.*) This argument is plainly inconsistent with *Twombly*, which advises courts to reject conjecture (i.e., speculation) when ruling on a motion to dismiss. *See Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . ."); *see also Yucis*, 813 F. App'x at 785 (rejecting allegations that are "so general as to be conclusory, and [are] thus not entitled to the presumption of truth on a motion to dismiss"); *Cooper v. Lantern Entm't LLC (In re Weinstein Co. Holdings, LLC)*, 2020 WL 1320821, at *13 (D. Del. Mar. 20, 2020) ("We need not credit purely conclusory allegations, indulge in speculation, or draw improbable inferences. Whether an inference is reasonable cannot be decided in a vacuum; it must be considered 'in light of the competing inferences' to the contrary") (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986))).

TSG cites *Connelly* on this point as well, arguing that even "unrealistic or nonsensical" factual allegations should be credited at the motion to dismiss stage. (*See* TSG Br. at 38 (quoting *Connelly*, 809 F.3d at 789 (citation omitted))). But as that case makes clear, the allegation in question still must represent a "historical fact." *Connelly*, 809 F.3d at 789. The presumption does not apply to labels and conclusions, such as those that TSG asserts (e.g., "throw in the towel"; "immediately pivoted towards bankruptcy"; "ma[de] no effort"; etc.) in both the Complaint and opening brief. (*See, e.g.,* TSG Br. at 14, 36-37). *See also West v. Phelps*, 2019 WL 2193489, at *2 (D. Del. May 21, 2019) (noting that a "complaint must do more than simply provide 'labels and

conclusions'") (citation omitted).  The Court agrees that the Bankruptcy Court carefully drew that distinction here.  (*See* A0030-32).  As such, its decision fits easily within the parameters established by *Twombly* and *Iqbal* – and reaffirmed by the Third Circuit.  *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); *In re Allergan ERISA Litig*., 975 F.3d 348, 355-56 (3d Cir. 2020) (affirming dismissal and rejecting appellant's argument "that the District Court ignored their 'well-pled and plausible allegations'" regarding breach of fiduciary duty because "the allegations referred to are not well-pled facts but are instead [factual] conclusions entitled to no deference").

Finally, TSG argues that reversal is required because its allegations are in line with cases that have sustained duty of loyalty claims against directors based on an abdication of their responsibilities.  (TSG Br. at 34-36).  None of these cases would support a reversal.  TSG cites *Bridgeport*, which "characterized abdication of directorial duty as evidence of disloyalty."  (*Id*. at 34).  As discussed, the directors in that case delegated all of "their decision-making authority to a new chief operating officer who, without any supervision by the Board, negotiated an asset sale without hiring investment bankers to 'shop' the deal, or conducting a thorough search for potential strategic buyers."  (A0031).  The Counterclaims, by contrast, affirm that the Board and Audit Committee here were proactive and engaged: the Directors, as alleged, started investigating as soon as they learned about KPMG's concerns; enlisted the assistance of outside counsel, to help with the initial probe; retained RKO to conduct an independent investigation after KPMG requested it; began exploring multiple strategic alternatives; solicited bids for PSG's assets through an orderly process that unfolded over several months under the guidance of its investment banking firm; retained several other outside advisors to provide specialized expertise; and engaged in numerous other acts of contingency planning, like negotiating with PSG's lenders.  (Counterclaim ¶¶ 70-72, 75 (A0153-54), ¶ 91 (A0157)).  As the Bankruptcy Court correctly determined, these

cases are not similar.  (*See* A0031 (agreeing that the Directors' "actions are easily distinguished from those taken by the directors in *Bridgeport*")).

TSG also cites *Rich ex rel. Fuqi International, Inc. v. Yu Kwai Chong*, 66 A.3d 963 (Del. Ch. 2013), in which "the court found sufficient allegations of bad faith where the plaintiff plead that the directors "abdicated [their] responsibilities because the investigation [of the shareholder demand] has been left in limbo, with no progress, for several months."  (*See* TSG Br. at 34).  In that case, however, despite uncovering colorable evidence of wrongdoing, the directors were accused of "thwart[ing]" an internal investigation "by de-funding the advisors to the Audit Committee" who were overseeing it, causing certain independent directors to resign "in protest of management's actions."  *Id*. at 979 (noting that management's failure to "pay for the professional advisors – including auditors and legal counsel" not only "failed to move the investigation forward, but . . . [actually] impeded [the] investigation.").  Nothing similar is pled here.

TSG further cites *John Swann Holding Corp. ex rel. ClubCreate, Inc. v. Simmons*, 62 F. Supp. 3d 304, 311 (S.D.N.Y. 2014), which upheld a duty of loyalty claim, stating "[w]hen directors have actual knowledge of illegal or improper conduct, the directors must take good faith steps to remedy the problem."  (TSG Br. at 34).  In that case, however, three directors – including Corey Simmons, the company's co-founder, CEO and Chairman – were accused of conspiring to, among other things, hide the founder's misappropriation of corporate assets for personal use.  As pled, "[d]efendants knew of [the company's] numerous contractual failings [vis-á-plaintiff] and Simmons' alleged diversions of corporate funds but deliberately chose not to rectify the situation or protect stockholders from further harm."  *Id*. at 311.  Accordingly, the court held that plaintiff had sufficiently alleged "a conscious disregard for [d]efendants' directorial duties."  *Id*. at 312. These allegations are – in duration, severity, and scop – vastly different from those pled here.  As the Directors point out, *John Swann* illustrates the marked difference between the allegations

contained in the Counterclaims and those necessary to meet "the heavy burden imposed on . . . the standard for breach of the duty of loyalty." *Nystrom v. Vuppuluri (In re Essar Steel Minn. LLC)*, 2019 WL 2246712, at \*7 (Bankr. D. Del. May 23, 2019).

TSG argues that it "is sufficient to plead a duty of loyalty claim" by merely framing "a board's decision . . . to file, or not [to] file, for bankruptcy" as "not [being] in the best interests of the company." (TSG Br. at 35). TSG has not cited any Third Circuit authority in support of this contention, however. And, as the Directors correctly point out, the out-of-Circuit decisions do not establish such a sweeping – and watered down – test for pleading a duty of loyalty claim either. TSG cites *FDIC v. Barton*, 1998 WL 169696 (E.D. La. Apr. 8, 1998), but that case does not address the duty of loyalty; rather, it focuses on whether the directors breached their duty of care by causing the company to file for bankruptcy in violation of a consent decree. *See id.* at \*1-2. Moreover, in *Barton* (unlike this case), there was nothing in the court's decision to suggest the directors had attempted to make an informed decision about the advisability of a bankruptcy filing.

TSG further cites *Dux Capital Management v. Chen*, 2004 WL 1936309 (N.D. Cal. Aug. 31, 2004), *aff'd sub nom. Davis v. Yageo Corp.*, 481 F.3d 661 (9th Cir. 2007), but as the Bankruptcy Court correctly noted, that case involved more egregious allegations of an entrenchment scheme aimed at freezing out minority shareholders. (*See* A0031 (observing that in *Dux Capital*, "the company's directors pursued bankruptcy . . . [to] squeeze out the minority shareholders' interests, without any professional's recommendations and without considering alternatives that might yield some value to the corporation")). Similarly, *Skorheim v. Flanders*, 2011 WL 13175962 (C.D. Cal. Feb. 22, 2011), involved grave claims of misconduct – i.e., letting a statute of limitations lapse. *See id.* at \*1-2, 6-9 (alleging directors failed to file for bankruptcy in time to preserve a fraudulent transfer action stemming from transactions – dubbed the "2004 Cash Out" – that had led to the company's insolvency).

30

Finally, TSG cites *Tower Air* in support of its claims against the Directors as well, arguing that in "the Third Circuit[,] allegations of . . . [an] 'irrational decision[-]making process' [are] sufficient to plead a breach of the duty of loyalty claim against directors." (TSG Br. at 34 (quoting *Tower Air*, 416 F.3d at 240)).  But as the Directors correctly point out, plaintiffs in that case pled facts from which to plausibly infer that the directors were "inattenti[ve] when writing multi-million dollar checks," including for "multi-million dollar leases of jet engines." *Tower Air*, 416 F.3d at 240.  The allegations contained in the Counterclaims support an opposite inference – that the Directors were not only attentive but actively discharging their duties throughout the relevant time period.

The Court finds no error in the Bankruptcy Court's application of *Iqbal* and *Twombly* in determining that the factual allegations did not support a reasonable inference that the Directors were liable for breach of the duty of loyalty.

### D.      Waste Claim Against the Directors

TSG argues that the Bankruptcy Court's erred in dismissing TSG's corporate waste claim against the Directors.  (*See* TSG Br. at 38-41).  According to TSG, the Counterclaims carefully outline the futility of the RKO investigation, which cost PSG $6 million.  (TSG. Br. at 28; APP0180 ¶ 193).  TSG argues that one of the Bankruptcy Court's predicate findings in dismissing the corporate waste claim was that the Directors could not be liable for corporate waste when KPMG refused to alter its stance as to the need for the investigation, and "[t]he allegations therefore show that the investigation was necessary."  (APP0034).  But this finding overlooks TSG's allegations that the Directors made the decision to file for bankruptcy even prior to commencing the investigation in any meaningful way.

The Court disagrees.  The Bankruptcy Court carefully examined TSG's allegations but found they had failed to meet the "onerous" and "very rarely" satisfied test for pleading corporate

waste.  *See, e.g., Gavin v. Tousignant (In re Ultimate Escapes Holdings LLC),* 682 F. App'x 125, 131 (3d Cir. 2017) (affirming dismissal of corporate waste claim because "[w]hile perhaps [defendants] could have found a better source of funding . . . we cannot conclude on this record that the [funding] Agreement amounted to waste.") (citation omitted); *see also Walt Disney*, 906 A.2d at 75 (describing "the high hurdle required to establish waste").

First, the Bankruptcy Court was within its discretion in holding that TSG's waste claim relied on a collection of "conclusory statements."  (A0034).  TSG argues that the Bankruptcy Court viewed these statements "in isolation" while ignoring "extensive factual allegations" detailed elsewhere in the Complaint.  (TSG Br. at 39-40).  These "allegations," however, are the same "labels and conclusions" that the Bankruptcy Court rejected in dismissing TSG's duty of loyalty claim.  (*See, e.g.*, A0034 (rejecting as conclusory allegation that "the Board never intended to complete the investigation"); *id*. (refusing to credit naked assertion that "the Board and Audit Committee immediately . . . 'threw in the towel' and determined to file for bankruptcy relief.")).

Second, the Court finds no support for TSG's contention that the Bankruptcy Court "ma[de] improper inferences" in favor of the Directors by concluding both that the investigation was "necessary" and that there were "legitimate grounds for continuing" it.  (*See* TSG Br. at 40 (citing A0034)).  This theory focuses on "'the economics of the investigation'" and whether it was "necessary" for RKO to continue working once PSG's Board had decided to file for bankruptcy. (*Id*. at 40-41).  According to TSG, any work performed by RKO after this point "wasted millions of dollars" and served no useful purpose (*id*. at 39-40; *see also id.* at 41), making it reversible error to rule otherwise.  But the Bankruptcy Court held that "there were legitimate grounds for continuing the investigation while planning for different contingencies – as a practical matter, it would have been difficult to attract third-party bidders if the Board could not represent that it was conducting a credible investigation."  (A0034).  Indeed, common sense suggests that no

unaffiliated third party would have bought PSG's assets if it thought that the Company's financial performance had been artificially inflated by accounting fraud.  (*See DeMoss v. Delaware State Univ.*, 2018 WL 4955231, at *3 (D. Del. 2018) ("Deciding whether a claim is plausible . . . 'requires the reviewing court to draw on its judicial experience and common sense.'") (citation omitted).  This kind of logical, real world conclusion is expressly supported by Supreme Court precedent, *see Iqbal*, 556 U.S. at 679-80, and does not constitute reversible error.  As to value, the Bankruptcy Court was not, as TSG asserts, engaging in a form of impermissible judicial freelancing.  To the contrary, the Bankruptcy Court relied on TSG's own allegations in concluding that "[the] transaction . . . admittedly paid all secured and unsecured creditors in full."  (A0031 n.133).  This indicium of value – which comes straight from the Complaint – confirms that TSG has not met, and cannot meet, the "onerous" and "very rarely" satisfied test for pleading corporate waste.  *Ultimate Escapes,* 682 F. App'x at 131.

The Court finds no error in the Bankruptcy Court's conclusion that TSG failed to plead facts sufficient to support a plausible claim of corporate waste.

### E.    Breach of Fiduciary Duty Claims Under British Columbia Law

TSG does not dispute "that claims for breach of fiduciary duty under British Columbia law are held to essentially the same standard as claims under Delaware law."  (TSG Br. at 41).  TSG merely asks that the Court reinstate those claims to the same extent it reinstates TSG's other claims. (*See id*.)  As explained above, however, TSG has failed to establish any error committed by the Bankruptcy Court in relation to the Delaware law claims.  Accordingly, this Court affirms the Bankruptcy Court's dismissal of TSG's claims under British Columbia law as well.

## V.    <u>CONCLUSION</u>

In dismissing the Counterclaims, the Bankruptcy Court followed the process required by *Iqbal* and *Twombly*: it carefully reviewed each of the allegations, drew all appropriate inferences

in favor of TSG, and properly distinguished between factual and conclusory allegations.  For the reasons set forth herein, the Order is affirmed.  An appropriate order will be entered.